XAVIER BECERRA
Attorney General of California
NICKLAS A. AKERS
Senior Assistant Attorney General
BERNARD A. ESKANDARI (SBN 244395)
Supervising Deputy Attorney General
AMOS E. HARTSTON (SBN 186471)
STEVEN D. DESALVO (SBN 199904)
DANIEL A. OSBORN (SBN 311037)
Deputy Attorneys General
 300 South Spring Street, Suite 1702
 Los Angeles, CA 90013
 Tel: (213) 269-6348
 Fax: (213) 897-4951
 Email: bernard.eskandari@doj.ca.gov

*Attorneys for Plaintiff the People of the State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **PEOPLE OF THE STATE OF CALIFORNIA** ex rel. Xavier Becerra, Attorney General of California,<br><br>Plaintiff,<br><br>v.<br><br>**BETSY DEVOS**, in her official capacity as Secretary of Education, and **UNITED STATES DEPARTMENT OF EDUCATION**,<br><br>Defendants. | Case No. 20-cv-01889<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>**ADMINISTRATIVE PROCEDURE ACT CASE** |

## INTRODUCTION

1.      The United States Department of Education ("ED") has illegally rescinded its 2014 "gainful employment" rule, which afforded key protections to both students and taxpayers against abuses by for-profit colleges and other institutions that offer career training programs. This rule

1

interpreted and implemented a statutory provision in the Higher Education Act of 1965 that requires career-oriented programs to "prepare students for gainful employment in a recognized occupation." Programs that do not prepare their students for gainful employment risk losing eligibility to participate in federal financial aid. The illegal repeal of the 2014 rule will incentivize predatory schools to engage in manipulative recruiting tactics, raise tuition, and deliver low-quality instruction, without regard to whether their programs leave students with poor job prospects, worthless credentials, and mountains of student debt. In the end, as even ED acknowledges, taxpayers will bear the burden of billions of dollars in uncollectable debt that ED should never have lent in the first place. As with so many of ED's recent regulatory endeavors, in its haste to repeal the rule, ED acted illegally in violation of the Administrative Procedure Act. The repeal must therefore be declared unlawful and set aside.

## JURISDICTION AND VENUE

2.      This action arises under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706. This Court has subject-matter jurisdiction over this action because it is a case arising under federal law. 28 U.S.C. § 1331.

3.      An actual, present, and justiciable controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court has authority to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202.

4.      Venue is proper in this judicial district under 28 U.S.C. § 1391(e)(1) because the People of the State of California reside in this district and no real property is involved in this action.

## INTRADISTRICT ASSIGNMENT

5.      Assignment to the San Jose Division is appropriate because a substantial part of the events or omissions giving rise to the claims in this complaint occurred in this division. *See* Local Rule 3-2(c). Among other events, a number of for-profit colleges have campuses in the counties of Santa Clara, Santa Cruz, San Benito, and Monterey. Programs offered at these campuses and the students that enroll in them are substantially affected by the challenged agency action at issue in this case.

**PARTIES**

6.     The People of the State of California ("California" or "People") bring this action by and through their Attorney General, Xavier Becerra, California's chief law officer. Cal. Const. art. V, § 13.

7.     Defendant Betsy DeVos is the Secretary of Education and is being sued in her official capacity. Her official address is 400 Maryland Avenue, SW, Washington, D.C. 20202.

8.     Defendant the United States Department of Education is an executive agency of the United States government. Its principal address is 400 Maryland Avenue, SW, Washington, D.C. 20202.

**FACTUAL ALLEGATIONS**

**I.     THE HIGHER EDUCATION ACT AND GAINFUL EMPLOYMENT**

9.     Title IV of the Higher Education Act of 1965, as amended ("HEA"), 20 U.S.C. § 1070 et seq., authorizes federal student-assistance programs that provide financial aid to students ("Title IV aid") to attend certain postsecondary institutions of higher education (a "school" or an "institution").

10.     Each year, ED provides billions of dollars in Title IV aid in the form of federal loans, work-study, and grants. In fiscal year 2017, for example, ED provided approximately $122.5 billion to, or on behalf of, students.[1]

11.     Students receiving Title IV aid attend public, private nonprofit, and for-profit institutions.

12.     Title IV aid provides critical assistance to prospective and enrolled students and fosters access to higher education. According to data released by ED in 2018, 72% of all undergraduates received some type of financial aid to gain access to postsecondary education.[2] According to these same data, students attending for-profit schools are even more likely to need

---

[1] Federal Student Aid, *Fiscal Year 2018 Annual Report*, at 8 (Nov. 15, 2018), http://www2.ed.gov/about/reports/annual/2018report/fsa-report.pdf.
[2] National Center for Education Statistics, *2015–16 National Postsecondary Student Aid Study*, at 5 (Jan. 2018), http://nces.ed.gov/pubs2018/2018466.pdf.

financial aid than students attending public institutions.[3]

13.     For-profit schools are private entities that are owned and operated by businesses.[4]

14.     For-profit schools are ultimately accountable by law for the returns they produce for shareholders.[5]

15.     For-profit schools receive the vast majority of their revenue from Title IV funds. For example, in 2009, the 15 publicly traded, for-profit education companies received 86% of their revenues from Title IV funds.[6]

16.     The HEA prohibits for-profit schools from deriving more than 90% of their revenue from Title IV funds. 20 U.S.C. § 1094(a)(24).

17.     Students who attend for-profit schools are, with alarming frequency, unable to repay their education debt. For example, according to figures released by ED, in fiscal year 2016, more than 15% of students who attended for-profit schools defaulted on their federal student loans, compared to 9.6% of students who attended public schools and 6.6% of students who attended private nonprofit institutions. Defaults by students who attended for-profit schools accounted for 32.6% of all federal student-loan defaults in fiscal year 2016, despite accounting for only 21% of all borrowers entering repayment.[7]

18.     More than 98% of the fraud complaints received by ED are from students that attended a for-profit school.[8]

19.     ED estimates that for-profit schools are seven times more likely to engage in misconduct than public and other nonprofit institutions. 83 Fed. Reg. 37,297-98 (Table 5).

---

[3] *Id.* at 6.
[4] U.S. Senate, Health, Education, Labor and Pensions Committee, *For Profit Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success*, at 12 (July 30, 2012), http://www.help.senate.gov/imo/media/for_profit_report/Contents.pdf.
[5] *Id.*
[6] *Id.* at 3.
[7] Federal Student Aid, *Comparison of FY 2016 Official National Cohort Default Rates to Prior Two Official Cohort Default Rates* (Aug. 4, 2019), http://www2.ed.gov/offices/OSFAP/defaultmanagement/schooltyperates.pdf.
[8] The Century Foundation, *For-Profit Colleges Continue to Generate Most Loan Relief Claims* (June 25, 2019), http://tcf.org/content/commentary/profit-colleges-continue-generate-loan-relief-claims/.

20.     Schools substantially benefit by accepting tuition payments from students receiving Title IV aid, regardless whether those students are ultimately able to repay their federal loans. Accordingly, Congress included statutory requirements in the HEA to ensure against abuse by institutions, particularly for-profit schools and career programs at other institutions.

21.     The HEA's statutory "gainful employment" ("GE") provision at issue in this action is one such requirement. Under the HEA, certain educational programs offered by "proprietary institutions of higher education" (i.e., for-profit schools), "postsecondary vocational institutions" (typically, schools that offers short-term, career-focused programs), and public and non-profit institutions that offer non-degree (certificate) programs must "prepare students for gainful employment in a recognized occupation" to become and remain eligible to participate in Title IV aid. 20 U.S.C. § 1002(b)(1)(A)(i), (c)(1)(A); *see also* 20 U.S.C. § 1088(b)(1)(A)(i).

## II.     THE 2011 GE RULE AND LEGAL CHALLENGES

22.     For decades, ED left undefined the statutory term, "prepare students for gainful employment in a recognized occupation."

23.     In 2010 and 2011, ED published final regulations, 75 Fed. Reg. 66,665, 75 Fed. Reg. 66,832, 76 Fed. Reg. 34,386 (collectively, "2011 GE Rule"), which, among other things, defined and implemented this statutory term.

24.     At the time, ED stated, "Adopting a definition now gives meaning to an undefined statutory term, thereby fulfilling the Department's duty to enforce the provisions of the HEA in a clear and meaningful way." 76 Fed. Reg. at 34,393.

25.     The 2011 GE Rule sought to protect students and taxpayers from predatory schools that reap the benefits of Title IV aid but offer low-quality programs, with poor job prospects, that leave their graduates with unaffordable debt.

26.     Among other things, the 2011 GE Rule assessed whether covered programs (i.e., "GE programs") provided training that leads to "gainful employment in a recognized occupation" by applying three metrics. Two metrics focused on graduates' loan payments as a portion of their annual earnings or discretionary incomes (i.e., the debt-to-earnings tests). The third metric examined a program's annual loan-repayment rate to measure whether all attendees (not just

graduates) were actually repaying their student loans.

27.     ED set up a framework by which a program "failed" if it did not meet certain thresholds under these metrics. 76 Fed. Reg. at 34,452. Programs subject to the rule were deemed "ineligible" for continued participation in Title IV aid if they failed to meet these thresholds for three out of the four most recent fiscal years. 76 Fed. Reg. at 34,452.

28.     After ED published the final 2011 GE Rule, a trade group representing for-profit schools sued to challenge numerous provisions of the rule. *Ass'n of Private Colls. & Univs. v. Duncan*, 870 F. Supp. 2d 133 (D.D.C. 2012).

29.     The U.S. District Court for the District of Columbia held that the relevant statutory command was the phrase "prepare students for gainful employment in a recognized occupation" and that the phrase is ambiguous, meaning that it was proper for ED to promulgate regulations to fill the "considerable gap" left by Congress:

> There is no unambiguous meaning of what makes employment "gainful": the phrase need not mean "any job that pays." "Gainful employment" does not unambiguously encompass work for minimal gain, nor does it necessarily describe the gross profits from a given activity rather than the net gains derived therefrom. Moreover—and more importantly—the relevant statutory command is that a given program "prepare students for gainful employment in a recognized occupation." The Department's regulations are an attempt to assess whether certain programs in fact provide such preparation. *See, e.g.*, Debt Measure Rule, 76 Fed.Reg. at 34,395 ("The Department [established the debt measures] with the goal of identifying programs that are failing to prepare students for gainful employment in a recognized occupation . . . ."). The real question, then, is not how much gain is enough but rather how much preparation is enough. The Department has attempted to answer that question by reference to the economic success of a program's former students. The statute does not "unambiguously foreclose[] the agency's interpretation," *Nat'l Cable [& Telecomms. Ass'n v. F.C.C.*, 567 F.3d 659, 663 (D.C. Cir. 2009)], because it does not tell the Department how to determine which programs actually prepare their students and which programs do not. "The power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." *Chevron [v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984)] (quoting *Morton v. Ruiz*, 415 U.S. 199[](1974)) (ellipses in original). The means of determining whether a program "prepare[s] students for gainful employment in a recognized occupation" is a considerable gap, which the Department has promulgated rules to fill.

*Ass'n of Private Colls. & Univs.*, 870 F. Supp. 2d at 146 (first, second, third, fifth, and eighth

alteration in original).

30.     The court upheld the 2011 GE Rule's two debt-to-earnings metrics but held that ED lacked a reasoned basis for the third metric based on loan-repayment rates. *Id*. The court also held that because the third metric was not severable from the other two, it was necessary to vacate the eligibility metrics in their entirety. *Id*. at 154-55.

31.     ED subsequently moved to amend the decision, which the court denied in 2013. *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 930 F. Supp. 2d 210 (D.D.C. 2013).

### III.   THE 2014 GE RULE

32.     In March 2014, ED restarted the GE rulemaking process by issuing a notice of proposed rulemaking:

> The proposed regulations are intended to address growing concerns about educational programs that, as a condition of eligibility for title IV, HEA program funds, are required by statute to provide training that prepares students for gainful employment in a recognized occupation (GE programs), but instead are leaving students with unaffordable levels of loan debt in relation to their earnings, or leading to default. Many GE programs are producing positive student outcomes. But a disproportionate number are failing to do so.

79 Fed. Reg. 16,426.

33.     ED published final regulations in October 2014. 79 Fed. Reg. at 64,890 ("2014 GE Rule"). At the time, ED stated the following:

> [T]he Department is concerned that a number of GE programs: (1) Do not train students in the skills they need to obtain and maintain jobs in the occupation for which the program purports to provide training, (2) provide training for an occupation for which low wages do not justify program costs, and (3) are experiencing a high number of withdrawals or "churn" because relatively large numbers of students enroll but few, or none, complete the program, which can often lead to default. We are also concerned about the growing evidence, from Federal and State investigations and qui tam lawsuits, that many GE programs are engaging in aggressive and deceptive marketing and recruiting practices. As a result of these practices, prospective students and their families are potentially being pressured and misled into critical decisions regarding their educational investments that are against their interests.

79 Fed. Reg. at 64,890.

34.     The 2014 GE Rule again defined what it means for a program to "prepare students for gainful employment in a recognized occupation."

7

35.     The 2014 GE Rule created a process by which an institution would establish the initial eligibility of a GE program to participate in the Title IV aid ("Certification Requirement") and a process by which ED would determine whether a GE program would remain eligible to participate in the Title IV ("Eligibility Metrics").

36.     Under the Certification Requirement, 34 C.F.R. § 668.414, an institution would have to certify that each of its GE programs met the initial eligibility requirements of the 2014 GE Rule, 34 C.F.R. § 668.414(d), at the time of certification.

37.     The Eligibility Metrics established the thresholds that a program had to meet in order to remain eligible to participate.

38.     For the 2014 GE Rule, ED abandoned the third loan-repayment metric from the 2011 GE Rule that the U.S. District Court for the District of Columbia rejected. The 2014 GE Rule instead applied two metrics measuring debt-to-income ratios.

39.     These two debt-to-income metrics, also called debt-to-earnings rates ("D/E Rates"), are the centerpiece of the 2014 GE Rule. These rates measure the educational debt of a program's graduates, both as a percentage of their annual earnings and their discretionary income, to assess students' ability to repay their loans. 34 C.F.R. § 668.404; 79 Fed. Reg. at 64,950.

40.     The D/E Rates for a particular program are calculated using mean and median earnings data provided by the Social Security Administration. 34 C.F.R. § 668.404-405.

41.     Once a program is initially certified, the Eligibility Metrics set thresholds that must be met for a program to be considered "passing." For a program to satisfy the Eligibility Metrics of the 2014 GE Rule, its graduates need to meet only the threshold for one of the two D/E Rates. A program "passes" if its graduates' average annual loan payments are less than or equal to either 20% of their discretionary income *or* 8% of their annual earnings. A program "fails" if its graduates' average annual loan payments are more than both 30% of their discretionary income *and* 12% of their annual earnings. Programs that neither pass nor fail are "in the zone." A program is ineligible to participate in Title IV if it "fails" for any two of three consecutive years, or if it "fails" or is "in the zone" for four consecutive years. 34 C.F.R. § 668.403.

42.     The 2014 GE Rule also included critical provisions requiring schools to provide

prospective and enrolled students with written warnings about any of its GE programs for any year that the program could become ineligible to participate in Title IV during the next award year. 34 C.F.R. § 668.410.

43.     The 2014 GE Rule further included public disclosure requirements ("Disclosure Requirements"). 34 C.F.R. § 668.412. Institutions were required to provide certain information on webpages about their programs, in promotional materials, and, in certain circumstances, directly to students.

44.     In publishing the 2014 GE Rule, ED specifically responded to public comments asserting that it was exceeding its authority to administer Title IV. 79 Fed. Reg. at 64,892. In response to those comments, ED explained that its statutory authority for the 2014 GE Rule was derived primarily from three sources: (i) provisions of the HEA; (ii) the General Education Provisions Act; and (iii) ED's Organization Act. *Id.*

45.     ED also stated that the U.S. District Court for the District of Columbia had "confirmed" its authority to regulate covered programs. ED stated that "the court concluded that the phrase 'gainful employment in a recognized occupation' is ambiguous; in enacting a requirement that used that phrase, Congress delegated interpretive authority to the Department; and the Department's regulations were a reasonable interpretation of an ambiguous statutory command." 79 Fed. Reg. at 64,892-93; *see also* 79 Fed. Reg. at 64,891 ("The Department's authority for the regulations is also informed by the legislative history of the provisions of the HEA . . . as well as the rulings of the U.S. District Court for the District of Columbia . . . .").

46.     ED also received and responded to comments regarding the use of data from the Social Security Administration ("SSA earnings data") and, more specifically, whether the rule should be based on a different data source, such as data from the Bureau of Labor Statistics ("BLS"). 79 Fed. Reg. at 64,941. ED likewise considered other sources of earnings data that had not even been proposed by commenters but found no sources superior to the SSA earnings data. *See, e.g.*, 79 Fed. Reg. at 64,941-42 (exhaustively explaining why ED declined to use BLS data); *id*. at 64,956 ("We have confirmed with SSA that it does not have better data available to share with the Department").

9

IV.   **FEDERAL COURTS' REJECTION OF CHALLENGES TO THE 2014 GE RULE**

A.   ***Association of Proprietary Colleges v. Duncan*, 107 F. Supp. 3d 332 (S.D.N.Y. 2015)**

47.     As with the 2011 GE Rule, a trade group representing for-profit schools filed suit under the APA to challenge the 2014 GE Rule, this time in the U.S. District Court for the Southern District of New York. *Ass'n of Proprietary Colls. v. Duncan*, 107 F. Supp. 3d 332 (S.D.N.Y. 2015).

48.     The court held that the 2014 GE Rule was "a reasonable interpretation of an ambiguous statutory command" (i.e., that a given program "prepare students for gainful employment in a recognized occupation"). *Id.* at 363. In doing so, the court fully adopted the prior reasoning of the U.S. District Court for the District of Columbia, finding its "analysis thorough, [its] application of *Chevron* faithful to Supreme Court precedent, and [its] logic and reasoning persuasive." *Id.* at 359.

B.   ***Association of Private Sector Colleges and Universities v. Duncan*, 110 F. Supp. 3d 176 (D.D.C. 2015)**

49.     In addition, the same trade group that challenged the 2011 GE Rule again filed suit to challenge the 2014 GE Rule in the U.S. District Court for the District of Columbia. *See Ass'n of Private Sector Colls. & Univs. v. Duncan*, 110 F. Supp. 3d 176 (D.D.C. 2015).

50.     The U.S. District Court for the District of Columbia again considered whether the statutory phrase "prepare students for gainful employment in a recognized occupation" had a "plain meaning that the Department (and the Court) must simply implement," or whether the "language was ambiguous such that the Court should accept the Department's interpretation—assuming, of course, that its interpretation is a reasonable one." *Id.* at 184. The court agreed with ED and the prior federal decisions, which held that the phrase was "ambiguous" and "leaves a policy gap" for ED to fill. *Id.* at 186.

51.     The court considered and rejected 13 separate arguments that the 2014 GE Rule was arbitrary and capricious. *Id.* at 190-98.

52.     The court also considered ED's use of the SSA earnings data, holding that ED had determined that no better data existed and had done so "only after rejecting other possible sources

of data as inadequate." *Id.* at 195 (citing to ED's description of "problems with alternative data from the [BLS]").

53.     The trade group appealed, and the U.S. Court of Appeals for the D.C. Circuit affirmed in its entirety, "adopt[ing] the district court's analysis." *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 640 Fed. App'x 5, 9 (D.C. Cir. 2016).

## V.     THE 2014 GE RULE WAS WORKING AS INTENDED

54.     In January 2017, ED released the first set of D/E Rates. At the time, ED noted that "[t]he data show that, while many postsecondary programs offer value to students, there are a significant number of career training programs—specifically for-profit programs—that do not provide their graduates with a reasonable return on investment."[9]

55.     The released data further indicated "that over 800 programs serving hundreds of thousands of students fail the Department's accountability standards with an annual loan payment that is at least greater than 30 percent of discretionary income and greater than 12 percent of total earnings."[10] ED also noted, "Ninety-eight percent of these failing GE programs are offered by for-profit institutions."[11] Moreover, ED highlighted that "[a]n additional 1,239 programs received a 'zone' rate, with an annual loan payment that is between 20 and 30 percent of discretionary income or between 8 and 12 percent of total earnings."[12]

56.     Not a single GE program offered by a California public college or university received a "failing" or "in the zone" rating.[13] In other words, every GE program offered by a California public college or university prepared students for gainful employment as defined by the 2014 GE Rule.

57.     ED's data confirmed that the 2014 GE Rule was working as intended by identifying programs with poor student outcomes in relation to graduates' ability to repay their

---

[9]*Education Department Releases Final Debt-to-Earnings Rates for Gainful Employment Programs* (Jan. 9, 2017), http://www.ed.gov/news/press-releases/education-department-releases-final-debt-earnings-rates-gainful-employment-programs.

[10] *Id.*

[11] *Id.*

[12] *Id.*

[13] Complete rate data available from ED in Excel format here: http://studentaid.gov/sites/default/files/GE-DMYR-2015-Final-Rates.xls (last visited Mar. 17, 2020).

loans. Those programs were almost exclusively offered by for-profit schools.

**VI.   ED ILLEGALLY DELAYED AND THEN REPEALED THE 2014 GE RULE**

58.     After January 20, 2017, ED took a number of steps to undermine and delay the enforcement and operation of the 2014 GE Rule. *See* 82 Fed. Reg. 30,975, 30,976; 82 Fed. Reg. 39,362; 83 Fed. Reg. 28,177-78.

59.     In October 2017, a coalition of 18 attorneys general, including California, filed suit to challenge ED's constructive rescission of the 2014 GE Rule in violation of the APA. *Maryland v. U.S. Dep't of Educ.*, No. 17-02139 (D.D.C. Oct. 17, 2017). That action is pending.

60.     In August 2018, ED published a notice of proposed rulemaking, in which it proposed to rescind the 2014 GE Rule in its entirety. 83 Fed. Reg. 40,167.

61.     In July 2019, ED published final regulations to rescind the 2014 GE Rule in its entirety ("GE Repeal"). 84 Fed. Reg. 31,392.

62.     The effective date of the GE Repeal is July 1, 2020. *Id*. However, the Secretary exercised her authority to designate certain parts of the GE Repeal for "early implementation" at the discretion of each institution. 84 Fed. Reg. at 31,395-96. The Secretary has not required institutions to inform ED whether they have opted for early implementation of the GE Repeal.

63.     ED has acknowledged that the GE Repeal will harm prospective and enrolled students. ED stated, "To the extent non-passing programs remain accessible with the rescission of the 2014 Rule, some students may choose sub-optimal programs" that "have demonstrated a lower return on the student's investment, either through higher upfront costs, reduced earnings, or both." 84 Fed. Reg. at 31,445. ED further acknowledged that "this could lead to greater difficulty in repaying loans, increasing the use of income-driven repayment plans or risking defaults and the associated stress, increase costs, and reduced spending and investment on other priorities." *Id.*

64.     According to ED, elimination of the 2014 GE Rule will cost the federal government $6.2 billion over the next ten years. 84 Fed. Reg. at 31,392.

65.     In support of the GE Repeal, ED determined that it "did not need[] to define the term 'gainful employment' beyond what appears in the statute" and that, through the GE Repeal, ED was "confirm[ing] that it, in fact, is enforcing the law as written and as intended." 84 Fed.

Reg. at 31,401.

66.     However, in making this determination, ED failed to consider or even acknowledge the multiple decisions of the federal courts, all uniformly holding that the statutory GE phrase ("prepare students for gainful employment in a recognized occupation") is ambiguous and leaves a substantial regulatory gap for ED to fill.

67.     Moreover, prior to the GE Repeal, ED had repeatedly and consistently concluded that the statutory GE phrase was ambiguous. In the GE Repeal, ED failed to adequately explain its diametric change in position.

68.     In issuing the GE Repeal, ED reasoned that the 2014 GE Rule had a "disparate impact" on for-profit schools and was under-inclusive insofar as it did not apply to all institutions or programs. 84 Fed. Reg. at 31,392; *see also, e.g.*, 84 Fed. Reg. at 31,394 ("The [2014 GE Rule] failed to equitably hold *all* institutions accountable [for] student outcomes, such as student loan repayment.") (emphasis added). By premising the GE Repeal on its view that the 2014 GE Rule disproportionately impacted for-profit schools, ED failed to consider (i) that any "disparate impact" on these programs results from statutory distinctions, created by Congress, for Title IV eligibility between types of schools and types of programs; and (ii) that ED had previously rejected the position that the 2014 GE Rule was arbitrary because it disproportionally affected vocationally oriented programs.[14]

69.     In the GE Repeal, ED stated that the 2014 GE Rule's metrics impose "arbitrary thresholds," "lack an empirical basis," and were published without "sufficient, objective, and reliable basis." 84 Fed. Reg. at 31,392-01. ED further stated that "SSA data may be inaccurate," 84 Fed. Reg. at 31,410, that the "earnings portion of the D/E calculation [is] subject to significant errors," *id.* at 31,409, and use of the data will "[p]enalize programs," *id.* at 31,410.

70.     In making these and other statements as a basis for the GE Repeal, ED failed to base its findings on sufficient factual support or relevant evidence for a reasonable mind to accept it as adequate to support a conclusion.

---

[14] *See* Defs.' Reply in Supp. of Cross Mtn. for Summ. J. at 27-28, *APC v. Duncan*, No. 14-08838 (S.D.N.Y.) [Dkt. 54].

71.     Before, during, and after the publication of the GE Repeal, ED also incorporated the D/E Rates (and thus the 2014 GE Rule) into its implementation of a different set of higher-education regulations, known as its "borrower defense" regulations. Those regulations set forth a procedure and a standard by which student-borrowers can assert a defense to repayment of their federal student loans when they have been harmed by certain acts or omissions (including fraud) by their school. 20 U.S.C. § 1087e(h); *see also* 34 C.F.R. § 685.206(c)(1) (applicable to loans issued between July 1, 1995, and July 1, 2017).

72.     Between 1995 and January 20, 2017, ED granted approximately 30,000 borrower-defense claims from defrauded borrowers, almost exclusively from students harmed by the now-defunct for-profit, Corinthian Colleges, Inc. ("Corinthian"). In every case, ED provided the borrower with full relief, meaning that ED fully discharged the borrowers' relevant federal student loans and refunded all amounts previously paid.

73.     After January 20, 2017, ED sought to limit the relief granted to successful borrower-defense claimants. Specifically, on December 20, 2017, ED announced a new partial-relief methodology ("Partial-Relief Rule") applicable to students defrauded by Corinthian.[15] That methodology relied on ED's "detailed earnings information about the performance of graduates of GE programs in the same fields in which C[orinthian] borrowers enrolled," supposedly allowing ED to calculate "a measure of the value of the corresponding C[orinthian]-provided programs."[16] ED stated that it was able to do this only because of the 2014 GE Rule:

> Pursuant to its GE regulations at 34 C.F.R. part 668, subpart Q, the Department has determined whether specific GE programs adequately prepared students for gainful employment in a recognized occupation by examining the typical loan debt versus earnings information for program completers and setting specific "passing" levels for such debt-to-earnings ratios.[17]

---

[15] *Improved Borrower Defense Discharge Process Will Aid Defrauded Borrowers, Protect Taxpayers* (Dec. 20, 2017), http://www.ed.gov/news/press-releases/improved-borrower-defense-discharge-process-will-aid-defrauded-borrowers-protect-taxpayers.

[16] Internal ED memo from Acting General Counsel, Steven Menashi, to James Manning, at 8 (Dec. 14, 2017), available at http://int.nyt.com/data/documenthelper/6576-menashi-memo/e1518a22b8810dd9f9a3/optimized/full.pdf.

[17] *Id.*

74.     Far from calling into question the arbitrariness, reliability, or empirical basis of the 2014 GE Rule's metrics, ED touted that it was "in a unique position to perform" its analysis precisely because it possessed detailed data resulting from the 2014 GE Rule.[18]

75.     In other words, at the same time ED sought to delay, rescind, and repeal the 2014 GE Rule as purportedly unreliable when used as a requirement that schools must meet and as a protection for students and taxpayers, ED relied and continues to rely on that very same GE data as a basis to measure and limit borrower-defense relief for defrauded students.

76.     Further, in defending legal challenges to the Partial-Relief Rule and the related cuts to debt relief for student borrowers, ED has repeatedly relied on the 2014 GE Rule to justify its position that that Partial-Relief Rule is not arbitrary and capricious. For example, ED recently argued to the U.S. Court of Appeals for the Ninth Circuit that a comparison between passing GE programs and Corinthian programs is a non-arbitrary component to determining the amount of relief due to defrauded Corinthian students.[19] In this context, ED does not call into question the arbitrariness, reliability, or empirical basis of the 2014 GE Rule's metrics, but instead relies on and defends them.

77.     On December 10, 2019, ED announced a revised methodology for determining the measure of relief due to successful borrower-defense claimants.[20] ED again turned to and relied upon "publicly available 2017 Gainful Employment earnings data" and "Social Security Administration earnings."[21] ED's press release and a publicly available policy statement touts this data without acknowledging that ED criticized reliance on and use of those same data in the GE

---

[18] *Id.*; *see also Policy Statement Re: Tiered relief methodology to adjudicate certain borrower defense claims*, at 2 (Dec. 10, 2019), http://www.ed.gov/sites/default/files/documents/borrower-defense-relief.pdf ("[The Partial-Relief Rule] assessed the relief owed to borrowers . . . based on the extent to which . . . applicants in a given program generally had earnings similar to those of completers of similar programs that had a passing debt-to-earnings ratio under the Gainful Employment (GE) regulations . . . .").

[19] Supp. Br. of Defs.-Appellees at 4-6, *Calvillo Manriquez v. DeVos*, No. 18-16375 (9th Cir.) [Dkt. 58].

[20] *Secretary DeVos Approves New Methodology for Providing Student Loan Relief to Borrower Defense Applicants* (Dec. 10, 2019), http://www.ed.gov/news/press-releases/secretary-devos-approves-new-methodology-providing-student-loan-relief-borrower-defense-applicants.

[21] *Id.*

1    Repeal. [22]

2    **VII.  THE GE REPEAL HARMS CALIFORNIA'S PUBLIC COLLEGES AND UNIVERSITIES**

3         78.    The GE Repeal causes concrete and particularized injury to California by directly

4    and indirectly harming California's public colleges and universities.

5         79.    California's public colleges and universities, which offer educational programs

6    subject to the 2014 GE Rule, are competitors to for-profit schools.

7         80.    The mission of California's public colleges and universities is set by statute.

8    California Education Code § 66010.2 states that the California Community Colleges, the

9    California State University, and the University of California "share goals designed to provide

10   educational opportunity and success to the broadest possible range of our citizens . . . ."

11        81.    California's public colleges and universities specifically compete for and seek to

12   serve prospective and enrolled students of for-profit schools, and in particular students who have

13   been defrauded by for-profit schools or that attend competing schools that do not prepare them for

14   gainful employment.

15        82.    For example, restoring access to higher education for those who need it is a major

16   system priority for California Community Colleges. On September 21, 2015, the Board of

17   Governors of the California Community Colleges requested an additional $175 million in funding

18   in 2016-17 for increased access for approximately 70,000 students. The request was specifically

19   made to accommodate additional, expected enrollments from veterans returning from Iraq and

20   Afghanistan, and the closure of several for-profit schools, including Corinthian.

21        83.    California has an interest in promoting opportunities for education in California's

22   public colleges and universities and in deterring predatory schools, including for-profit schools,

23   from unfairly competing with them.

24        84.    In particular, the California Community Colleges positions itself as an alternative

25   to and a competitor of for-profit schools.

26

27        [22] *Id.*; *see also Policy Statement Re: Tiered relief methodology to adjudicate certain
     borrower defense claims*, at 8 (Dec. 10, 2019), http://www.ed.gov/sites/default/files/documents/
28   borrower-defense-relief.pdf.

85. With more than 2.1 million students at 115 colleges, the California Community Colleges is the largest system of higher education in the nation. The California Community Colleges provides students with the knowledge and background necessary to compete in today's economy. With a wide range of educational offerings, the colleges provide workforce training, basic courses in English and math, certificate and degree programs, and preparation for transfer to four-year institutions.

86. The California Community Colleges is an economic actor with an annual budget of over $10 billion.

87. According to ED's D/E Rates released in 2017, there were 274 non-passing GE programs in California. 270 of these—98.5%—were offered by for-profit schools. (The other four were offered by private nonprofit institutions.) According to those same data, every GE program offered by a California public college or university passed the 2014 GE Rule's metrics, including every GE program offered by the California Community Colleges.

88. The GE Repeal means that, despite their non-passing scores over potentially multiple years, GE programs at for-profit schools in California will continue to be eligible for Title IV aid and will therefore continue to draw in students, despite not preparing them for gainful employment. Accordingly, the California Community Colleges, as well as other California public colleges and universities, will face increased competition by for-profit schools that would otherwise be inaccessible to students but for the GE Repeal.

89. In addition, the financial wellbeing of the State and the mission of California's system of public education are harmed by the GE Repeal.

90. The GE Repeal impairs the educational mission of California's public colleges and universities. For example, it is within the mission of California's public colleges and universities to enroll a "diverse and representative student body," with "[p]articular efforts . . . made with regard to those who are historically and currently underrepresented in both their graduation rates from secondary institutions and in their attendance at California higher educational institutions." Cal. Educ. Code § 66010.2.

91. For-profit schools often advertise to students with modest financial resources.

17

Many of these students are the first in their families to seek higher education. Many for-profit schools have deliberately targeted low-income and minority residents with deceptive information about their programs and enrolled them in programs that were unlikely to lead to employment that would allow graduates to repay the high costs of tuition.

92.     As a result, low-income and minority residents are often the primary victims of conduct that the 2014 GE Rule was designed to prevent. Students of color account for more than half of undergraduate enrollment at for-profit schools and are disproportionately impacted by the high-cost, low-quality programs identified and addressed by the 2014 GE Rule.[23]

93.     Accordingly, because of the GE Repeal, California's public colleges and universities cannot enroll these diverse, underrepresented students that instead enroll in programs at for-profit schools that would have lost Title IV eligibility under the 2014 GE Rule. The inability to enroll these students harms the educational mission of California's public colleges and universities, as well as causing financial loss from the lost enrollment of these students.

94.     The loss of these students also harms California by depriving the State of the opportunity to hire them through the Federal Work-Study Program. 20 U.S.C. § 1087-51–1087-58. Employers eligible under the Federal Work-Study Program include, among others, California's public colleges and universities, as well as California state agencies. 20 U.S.C. § 1087-51(c). The program encourages students to participate in community-service activities and engenders in students a sense of social responsibility and commitment to the community. 20 U.S.C. § 1087-51(a). Financial aid through the Federal Work-Study Program mutually benefits both eligible students and eligible employers. Students benefit by earning money to help with their educational expenses. Employers benefit by receiving a subsidy from the federal government that, in most cases, covers more than 50% of the student's wages. In some cases, such as for reading or mathematics tutors, the federal share of the wages can be as high as 100%. Because of the GE Repeal, students will enroll in programs at for-profit schools that would

---

[23] National Center of Education Statistics, *A Profile of the Enrollment Patterns and Demographic Characteristics of Undergraduates at For-Profit Institutions* (Feb. 2017), http://nces.ed.gov/pubs2017/2017416.pdf.

otherwise be inaccessible, and California's public colleges and universities, as well as California state agencies, will be unable to hire these students.

## VIII. The GE Repeal Harms California's Fisc

95.     The GE Repeal causes concrete and particularized injury to California by directly and indirectly harming California's fisc.

96.     The California Student Aid Commission (CSAC) administers state financial-aid programs for students attending public and private universities, colleges, and vocational schools in California. CSAC's central mission is to make education beyond high school financially accessible to all Californians. Among other things, CSAC administers the Cal Grant program, a state-funded program that provides need-based grants to California students.

97.     Cal Grants are the largest source of California-funded student financial aid.

98.     Cal Grant spending has more than doubled over the past decade. Cal Grant spending increased from $1 billion in 2009-10 to $2.6 billion in 2019-20.

99.     For a school to qualify to receive Cal Grants, that school must, among other things, be a "qualified institution" under federal law, 34 C.F.R. § 600, et. seq., meaning that it is institutionally eligible to participate in Title IV. *See* Cal. Code Regs. tit. 5, § 30009. A for-profit school is institutionally eligible to participate in Title IV only if, among other things, it "provides an eligible program of training, as defined in 34 CFR 668.8, to prepare students for gainful employment in a recognized occupation . . . ." 34 C.F.R. § 600.5(a)(5)(i)(A). Accordingly, state law incorporates federal law to determine which schools qualify to receive Cal Grants.

100.    CSAC has historically and publicly advocated for a strong GE rule.[24] The 2014 GE Rule complements California's state-based efforts to impose quality-control standards on institutions, which include the requirement that Cal Grant-participating schools meet state targets regarding graduation rates and student-loan default rates. Cal. Educ. Code § 69432.7(l)(3)(C), (F).

101.    Each year, California expends substantial funds in the form of Cal Grants to

---

[24] California Student Aid Commission, *Update on federal legislation and issues affecting Commission Programs* (June 21-22, 2018), http://www.csac.ca.gov/sites/main/files/file-attachments/20180621labitem8.pdf.

support students that attend programs at for-profit schools.

102.    Just as the GE Repeal is estimated to cost the federal government $6.2 billion over the next ten years, 84 Fed. Reg. 31,392, it also has a significant financial impact on California.

103.    When California, through the Cal Grant program, pays some or all of a student's costs to attend a non-passing GE program, California is harmed. California's interest is in investing in beneficial higher education programs, not programs that leave students with poor job prospects, worthless degrees, and unrepayable debt. ED acknowledges that non-passing GE programs may be "sub-optimal" by, among other things, leading to "reduced earnings" as compared to passing GE programs. 84 Fed. Reg. at 31,445.

104.    The GE Repeal means that California will expend, and has expended, substantial funds in Cal Grant aid to support students who attend or will attend non-passing GE programs, which would be inaccessible to students but for the GE Repeal.

105.    Further, additional CSAC funds will be expended to support students who attended a failing program that did not prepare them for gainful employment and who will then need to seek additional job training or education.

IX.    THE GE REPEAL HARMS CALIFORNIA RESIDENTS

106.    The GE Repeal causes concrete and particularized injury to California by directly and indirectly harming its residents, including thousands of prospective and enrolled students in educational programs that do not prepare them for gainful employment.

107.    The 2014 GE Rule was one of the key protections afforded to prospective and enrolled students against predatory schools. Because of the GE Repeal, these predatory schools will no longer risk having their access to Title IV aid cut off for loading students with debts that they cannot repay.

108.    More than 56,000 California students graduated from non-passing GE programs. These students hold $930 million in federal student-loan debt.[25]

---

[25] The Institute for College Access and Success, *How Much Did Students Borrow to Attend the Worst-Performing Career Education Programs?* (Aug. 2018), http://ticas.org/files/pub_files/ge_total_debt_fact_sheet.pdf.

109.   With the GE Repeal, tens of thousands of additional California students will attend programs that are non-passing under the 2014 GE Rule. These students will not be provided notice or information about these programs' poor job and earnings prospects.

110.   ED acknowledges that the GE Repeal harms students. *See, e.g.*, 84 Fed. Reg. at 31,445 ("To the extent non-passing programs remain accessible with the rescission of the 2014 Rule, some students may choose sub-optimal programs" that "have demonstrated a lower return on the student's investment, either through higher upfront costs, reduced earnings, or both.")

111.   ED further acknowledges that students that attend non-passing programs may experience "associated stress, increased costs, and reduced spending and investment on other priorities." 84 Fed. Reg. at 31,445.

112.   Under the 2014 GE Rule, institutions that are in jeopardy of losing eligibility to participate in Title IV must warn prospective and enrolled students. 34 C.F.R. § 668.410. A program that repeatedly does not pass the 2014 GE Rule's metrics becomes ineligible to participate in Title IV.

113.   The GE Repeal harms prospective and enrolled students by depriving them of critical warnings and disclosures that would allow them to make informed choices about enrolling in GE programs. Were prospective and enrolled students given complete information, including warnings required by the 2014 GE Rule, many would choose not to enroll or to discontinue enrollment in a program where graduates are unable to repay their student loans. Instead, students would choose to enroll in other programs at other schools, including at California's public colleges and universities.

114.   The same is true for GE programs at for-profit schools that are ineligible to participate in Title IV. Many students would not enroll, or would discontinue enrollment, in a program that is ineligible for Title IV aid. Instead, students would choose to enroll in programs at other schools where they could finance their education with Title IV aid, including at California's public colleges and universities.

## X.   THE GE REPEAL HARMS CALIFORNIA'S QUASI-SOVEREIGN INTEREST

115.   The GE Repeal causes concrete and particularized injury to California by directly

and indirectly harming its "quasi-sovereign" interests in the health and well-being—both physical and economic—of its residents.

116.    In particular, California's interests include avoiding economic harm to California student-borrowers; ensuring the well-being of its citizens, including through the promotion of their education; protecting consumers; and regulating education at all levels within the state.

117.    Efforts by for-profit schools to take advantage of and defraud low-income, vulnerable students seeking to better themselves through education impacts a substantial portion of California's population. Individual California students have suffered and will suffer concrete harm as a result of the GE Repeal.

118.    Education is critical to the future of California.

119.    Postsecondary education is an integral aspect of living and working in California.

120.    Funding education is one of the most important functions performed by the State. In 2016-17, higher education was the third largest General Fund expenditure, receiving $14.6 billion in resources, which accounted for 11.9% of General Fund resources. The majority of California's higher-education funding was divided among California's three postsecondary education systems: University of California; California State University; and California Community Colleges.

121.    States have historically been the primary regulators of higher education. Over time, the federal government's role in the regulation of higher education has increased.

122.    In particular, the HEA increased the role of the federal government in postsecondary education, primarily by creating the system of loans, subsidies, and grants that fund higher education to this day.

123.    California is a member of the "triad" of actors—the federal government, state governments, and accreditors—that currently regulate postsecondary education. One of the State's primary roles in the triad is consumer protection.

124.    California's consumer-protection laws regulate commerce in California and apply

to for-profit schools. *See, e.g.*, Cal. Bus. & Prof. Code § 17200, et seq.[26] The State is charged with enforcing California's consumer-protection laws and ensuring that these laws are uniformly and adequately enforced. California has a sovereign and quasi-sovereign interest in ensuring consumer protection within its borders. California also has a quasi-sovereign and parens patriae interest in protecting the health, safety, and welfare of its residents.

125.    The People have a strong interest in the regulation of postsecondary schools within its borders. Federal law, including the 2014 GE Rule and GE Repeal, has a significant impact on the regulation of these schools because of student reliance on federal financial aid.

126.    Federal financial aid plays a significant role in access to education within California.

127.    California has a tangible interest in the health, safety, and welfare of its residents, which are threatened both directly and indirectly by the GE Repeal. ED acknowledges that the GE Repeal harms students. *See, e.g.*, 84 Fed. Reg. at 31,445.

128.    The GE Repeal has substantial direct and indirect effects that harm the well-being of California residents, California's public colleges and universities, and other state interests.

## CLAIM 1

### AGENCY ACTION THAT IS ARBITRARY, CAPRICIOUS, OR OTHERWISE NOT IN ACCORDANCE WITH LAW

129.    California incorporates by reference the foregoing paragraphs.

130.    Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." 5 U.S.C. § 706(2)(A).

131.    The GE Repeal is a final agency action.

132.    Every federal court that has addressed the issue, including the U.S. Court of Appeals for the D.C. Circuit, the U.S. District Court for the District of Columbia, and the U.S.

---

[26] *See also, e.g.*, *Attorney General Kamala D. Harris Obtains $1.1 Billion Judgment Against Predatory For-Profit School Operator* (Mar. 23, 2016), http://oag.ca.gov/news/press-releases/attorney-general-kamala-d-harris-obtains-11-billion-judgment-against-predatory.

District Court for the Southern District of New York, has uniformly held that the statutory GE phrase ("prepare students for gainful employment in a recognized occupation") is ambiguous and leaves a regulatory gap for ED to fill.

133.    Prior to the issuance of the GE Repeal, ED also repeatedly took the position that the statutory GE phrase was ambiguous. Nevertheless, without adequate explanation for its changed position or for disregarding the decisions of multiple federal courts, ED stated, in issuing the GE Repeal, the that the statutory GE phrase is unambiguous and that it need not define the term "gainful employment" beyond what appears in the HEA.

134.    By contradicting the uniform holdings of the federal courts, without considering or even acknowledging those holdings, ED acted in a manner that is arbitrary, capricious, or otherwise not in accordance with law.

135.    By failing to sufficiently acknowledge and justify its own changed interpretation of the statutory GE phrase, ED acted in a manner that is arbitrary, capricious, or otherwise not in accordance with law.

136.    By basing the GE Repeal on its view that the 2014 GE Rule disproportionately impacted for-profit schools, ED failed to consider that the HEA itself established the distinction between programs that must "prepare students for gainful employment in a recognized occupation" and other programs, and ED relied on factors that Congress did not intend for it to consider. Therefore, ED acted in a manner that is arbitrary, capricious, or otherwise not in accordance with law.

137.    By eliminating the Disclosure Requirements without reasonable explanation or consideration of regulatory alternatives, and by relying on non-specific, non-binding plans for disclosure of information through a wholly separate source, ED acted in a manner that is arbitrary, capricious, or otherwise not in accordance with law.

138.    By eliminating the Eligibility Metrics and thresholds without consideration of obvious and known alternatives, and by changing its position regarding the Eligibility Metrics and thresholds without adequate explanation or good reason, ED acted in a manner that is arbitrary, capricious, or otherwise not in accordance with law.

139.    By eliminating the Certification Requirement without consideration of obvious and known alternatives, and by changing its position regarding the Certification Requirements without adequate explanation or good reason, ED acted in a manner that is arbitrary, capricious, or otherwise not in accordance with law.

140.    By issuing the GE Repeal without adequate factual support or substantial evidence to support its assertions, ED acted in a manner that is arbitrary, capricious, or otherwise not in accordance with law.

141.    By repeatedly disparaging the accuracy, reliability, and validity of the 2014 GE Rule's metrics, including the D/E Rates and the use of SSA earnings data to support those rates, while relying on those same rates and data to support and justify its decisions to reduce borrower-defense relief to defrauded borrowers, ED acted in a manner that is arbitrary, capricious, or otherwise not in accordance with law.

142.    By failing to sufficiently justify or even acknowledge its simultaneous embrace of the 2014 GE Rule to reduce student-borrower debt relief and rejection of that same 2014 GE Rule to set minimum standards for programs with poor student outcomes, ED acted in a manner that is arbitrary, capricious, or otherwise not in accordance with law.

143.    Accordingly, because ED failed to engage in reasoned decisionmaking based on the record before it, the GE Repeal is arbitrary, capricious, or otherwise not in accordance with law in contravention of 5 U.S.C. § 706(2).

/ / /

**DEMAND FOR RELIEF**

California respectfully requests that this Court enter a judgment in its favor and grant the following relief:

A.    Declare that ED violated the APA because the GE Repeal is arbitrary, capricious, or otherwise not in accordance with law;

B.    Hold unlawful, set aside, and vacate the GE Repeal;

C.    Enjoin ED from implementing the GE Repeal;

D.    Order ED to implement and enforce the 2014 GE Rule; and

E.    Grant other relief as the Court deems just and proper.

Dated: March 18, 2020                    Respectfully submitted,

XAVIER BECERRA
Attorney General of California

BERNARD A. ESKANDARI
Supervising Deputy Attorney General

*Attorneys for Plaintiff the People of the State of California*